### UNITED STATES DISTRICT COURT
#### DISTRICT OF MASSACHUSETTS

**Dr. William Wood**
**Carolyn Rosen**
**Green Line Advisory Group for Medford**
     Plaintiffs,

     vs.

**Massachusetts Department of Transportation**
**Richard Davey (in his capacity as Secretary of**
**Massachusetts Dept. of Transportation,**

**Federal Transit Administration, Region I**
**Mary Beth Mello (in her capacity as Regional**
**Administrator of the Federal Transit**
**Administration, Region I)**

     Defendants.

Civil Action No.

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.   Introduction

1. This is an action for declaratory and injunctive relief against the Defendants Massachusetts Department of Transportation ("Mass DOT") and Richard Davey alleging violations of the National Environment Policy Act (NEPA), 42 U.S.C. §§ 4321–4347.  This matter arises from the Federal Transit Administration,  Region I's (FTA Region I) decision to issue a Finding of No Significant Impact ("FONSI") approving the Green Line Extension Project ("GLX"),  without requirement for an environmental impact statement ("EIS").

2. The GLX includes encroachment on private residential and business property owners and requires obtaining local permits to allow the Massachusetts Bay

Transportation Authority ("MBTA"), a state agency, to make certain transportation Green Line infrastructure modification.

3. This project seeks to extend light rail transit service from current Lechmere Station through Somerville and into Medford down to College Avenue in Medford and Union Square in Somerville using a two branch operation that are both within the existing commuter rail rights of way.

4. A 3.4 mile light rail extension to College Avenue ("Medford Branch") would operate from a relocated Lechmere Station and head northwest, meeting the MBTA Lowell Line just south of Washington Street in Somerville. From Washington Street, the alignment would run parallel to the MBTA Lowell Line to Medford, and terminate at College Avenue in Medford.

5. A 0.9 mile light rail extension to Union Square in Somerville ("Union Square Branch") would operate within the MBTA Fitchburg Line from a relocated Lechmere Station to a terminus at Union Square in Somerville.  The project includes a proposed maintenance and storage facility that will be required to support the Green Line Extension.

6. The GLX requires infrastructure changes that include the relocation of the existing diesel-powered commuter rail tracks within the Proposed Action area that currently operate within the located right of way.

7. Relocation of diesel-powered commuter rail tracks would bring diesel locomotives that run in the Right of Way (ROW) closer in proximity to residential abutter homes and small businesses in the affected areas.

8. The GLX action would cause exhaust from diesel locomotive operation, known to contain carcinogens, in closer proximity to the identified human environment of

the environmental justice and disability populations living within the city of Medford.

9. An increased exposure to diesel locomotives along the proposed extension will have a significantly negative affect on the areas of human environment.

10. Based upon foreseeable circumstances in land development and its cumulative impact upon environmental resources would expose the city of Medford and its residents and businesses to greater diesel emission exposure from additional bus, truck and other diesel vehicles attracted to designated transit stations and increased commercial and residential land development proposed and planned.

11. FTA Region I issued the FONSI/EA on July 9, 2012 without requiring Mass DOT to adequately identify and analyze all relevant environmental and socioeconomic impacts of this Proposed Action.

12. FTA Region I failed to require Mass DOT to adequately analyze a reasonable range of mitigation to offset foreseeable effects.

13. Additionally, the FONIS/EA does not adequately mitigate the public engagement violations under Title VI and the Americans with Disabilities Act (ADA) as perpetrated by Mass DOT on the GLX project in excluding civil rights protected populations from representation on decision-making bodies.

14. The FTA Region I issued the FONSI and EA in violation of NEPA's requirements to prepare an environmental impact statement (EIS) for state actions that may significantly affect the human environment.

15. The FTA Region I issued a FONSI and EA based upon false claims by Mass DOT as submitted in its EA concerning the Preferred Alternative of Mystic Valley Parkway/Route 16.

16. By submitting an EA with false claims Mass DOT failed to provide, to the public, important, relevant items of information during the decision-making and public comment process concerning Mass DOT's Preferred Alternative of Mystic Valley Parkway/Route 16.

17. In its Response to Comments on the EA by Mass DOT states on page 6 of 10, "While the extension to Mystic Valley Parkway was reviewed and presented as an alternative, Mass DOT has decided to, for a variety of reasons which are described in the EA, terminate the project at College Avenue at this point in time. . . The environmental impacts of a future extension of the Green Line to Mystic Valley Parkway would be assessed using the NEPA process at a future date, if Federal action were to be involved.  Revisions to the EA are not required for any comments on the extension to Mystic Valley Parkway/Route 16."

18. Approximately three months before issuance of the FONSI by the FTA Region I, the Mass DOT put forth a motion at the Boston Metropolitan Planning Organization (MPO) meeting of April 19, 2012 to fund the Mystic Valley Parkway with federal funding within the FFY2013-2016 Transportation Investment Plan (TIP) specifically inviting only proponents to the meeting, as documented in MPO minutes, while omitting notice as required under MPO regulations to interested and affected parties including abutters and those in the environmental justice and disability populations to be affected by this Preferred Alternative.  This intent of this motion is to fund the Preferred Alternative to extend to Mystic Valley Parkway/Route16 in the same phase as the extension to College Avenue while Mass DOT was publicly stating they could not afford the Preferred Alternative, thus misleading those affected parties in the affected area.

19. The Mass DOT actions during the MPO meeting of April 19, 2012 circumvented the NEPA process of the GLX by creating an obfuscation of the process to mislead the public. And by putting forth the Preferred Alternative through the MPO process for federal funding prevented public awareness of any scientific analysis of environmental impact, traffic impact, land taking impact, construction impact and cumulative effects upon the human environment and socioeconomic impacts within the area. In fact, when State Representative Garballey on behalf of Dr. Wood, Carolyn Rosen and GLAM approached transit officials on concerns of this action on the Preferred Alternative, Mass DOT falsely claimed to this state representative that there was no opposition to the Preferred Alternative. These false claims were made despite evidence to the contrary that abutters, a noted environmental justice advocacy organization, with representation the affected area and interested disability persons and the Green Line Advisory Group for Medford put their public concerns on record in numerous public comments to Mass DOT, the MAPC and the MPO.

20. Mass DOT actions thus failed to meet Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and low income Populations, DOT order 5610.2, Dept. of Transportation Order to address environmental justice as living within the historic neighborhood of environmental justice and disability communities within the West Medford community.

21. Plaintiffs request that this Court declare Mass DOT's EA and FONSI inadequate under NEPA, enjoin issuance of any permits for the project, and declare any existing permits, void ab initio, which includes permits for construction or alteration of infrastructure on the GLX until Mass DOT is required to prepare an environmental impact statement (EIS) that adequately recognizes and analyzes

the full environmental impacts of the GLX and reviews a reasonable range of

alternatives and mitigation.

22. Plaintiffs also request this Court declare the Mass DOT's EA and the FTA Region

I FONSI inadequate under NEPA, enjoin issuance of any permits for the project,

and declare any existing permits void ab initio, until Mass DOT prepares and EIS

for the full intent of the GLX.

23. Plaintiffs further request this Court declare the Mass DOT's EA and FTA Region I

FONSI unlawful and set aside the decision, because the decision-making

process used by Mass DOT deprived Medford environmental justice and

disability populations of their rights to be represented, to fully know and to

participate in government decisions equally as required by United States

Constitution, Thirteenth Amendment, Section 1. "Neither slavery nor involuntary

servitude, except as a punishment for crime whereof the party shall have been

duly convicted, shall exist within the United States, or any place subject to their

jurisdiction." and subsequent legislation Title VI Civil Rights Act of 1964,

Executive Order 12898, the Americans with Disabilities Act of 1990, Section 504

of the Rehabilitation Act of 1973, and the Department of Transportation's

implementing regulations at 49 CFR Parts 21, 27. 27 and 38.

## II.     Parties

A. Plaintiffs

24. Dr. William Wood is a private citizen currently residing in the City of Medford,

Massachusetts with a Ph.D. in Disability Rights and a noted disability advocate

within the city of Medford and a self identified person with a disability.   Dr.

William Wood was appointed to sit on the now disbanded Citizens Advisory

Committee for the GLX project.  He also is a party in a FTA Office of Civil Rights

6

complaint, Complaint No. 09-0350, concerning the GLX project. Dr. Wood's concern is the potential impacts to people and environment of the City of Medford and the discriminatory process in which Mass DOT has conducted its public engagement process in marginalizing people with disabilities and those within the environmental justice community of Medford as is described in the FTA OCR complaint on the GLX.

25. Carolyn Rosen is a private citizen currently residing in the City of Medford, Massachusetts and has held the position of Chair in the local citizens group, the Green Line Advisory Group for Medford (GLAM). She is a self identified person with a disability. She also is a party in a FTA Office of Civil Rights complaint, Complaint No. 09-0350, concerning the GLX project. Carolyn Rosen's concern is the potential impacts to people and environment of the City of Medford and the discriminatory process in which Mass DOT has conducted its public engagement process in marginalizing people with disabilities and those within the environmental justice community of Medford as described in the FTA OCR complaint on the GLX.

26. The Green Line Advisory Group for Medford, better known in the City of Medford as GLAM, is a grassroots group consisting of members of the disability and environmental justice community along with small business members, abutters and other concerned citizens whose mission is the education of the Medford public about the proposed Green Line project and its impact. GLAM is an educational outreach as well as a community citizens' participatory grassroots group. GLAM also is a party in a FTA Office of Civil Rights complaint, Complaint No. 09-0350, concerning the GLX project. Their concern on the GLX are the lack of diverse citizen participation that occurred within the process, the lack of

transparency and full disclosure on social equity demands in this project along with environmental impacts concerning public health effects of diesel particulates on vulnerable populations and full environmental impacts upon the Mystic River. They have expressed their opposition to Preferred Alternative based upon the above concerns.

B. Defendants

27. Defendant, Massachusetts Department of Transportation (Mass DOT) and with offices located at Office of Transportation Planning Room 4150 Ten Park Plaza Boston, Mass. 02116 is the state agency in charge of the challenged environmental analysis, FONSI, final decision and permits for the GLX.

28. Defendant, Richard Davey is the Director of Mass DOT and is sued in that capacity.

29. Defendant, Federal Transit Administration, Region I and with offices located at 55 Broadway, Suite 920, Cambridge, Mass. 02142 is the federal agency who has issued a FONSI on the GLX with no request for an EIS and issued approval of a Preliminary Engineering (PE) design.

30. Defendant, Mary Beth Mello is the Regional Administrator of the Federal Transit Administration and is sued in that capacity.

III.    Jurisdiction and Venue

31. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question), § 1346 (United States as a defendant), § 2201 (injunctive relief), and § 2202 (declaratory relief). The current cause of action arises under the laws of the United States, including the NEPA. An actual, justiciable controversy exists between Plaintiffs and Defendants.

32. Venue in this court is proper under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

IV.     General Legal and Factual Allegations

A. Legal Framework

33. The National Environmental Policy Act of 1969, as amended,  [42 USC § 4321-4347] was adopted to establish a national policy for the environment, to provide for the establishment of a Council on Environmental Quality (CEQ), and to declare a national policy which will encourage productive and enjoyable harmony between man and his environment, to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man;  to enrich the understanding of the ecological systems and natural resources important to the Nation.  In addition, to implement these policies, NEPA requires agencies to undertake an assessment of the environmental effects of their proposed actions prior to making decisions.  Two major purposes of the environmental review process are better informed decisions and citizen involvement, both of which should lead to implementation of NEPA's policies as stated in the CEQ A Citizen's Guide to the NEPA.

34. NEPA and its implementing regulations require the agency to examine the direct, secondary and cumulative impacts of an environmental assessment, as well as to analyze reasonable alternatives to the proposed action.

35. The United States Constitution guarantees its citizen equal protection under the law and with subsequent legislation has stated that citizens should not be

involuntarily put in servitude to their government by incorporating such laws as Title VI Civil Rights Act of 1964, Executive Order 12898, the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, and the Department of Transportation's implementing regulations at 49 CFR Parts 21, 27. 27 and 38 that require the fundamental rights of public engagement, to be informed and to meaningfully participate in government decisions that impact their quality of life.  NEPA embodies these rights by requiring agencies to analyze and disclose information relevant to a decision, and to involve the diverse public in its decision-making process.

B. Procedural Background

36. The Mass DOT and the MBTA prepared an Environmental Assessment (EA) in conformance with the NEPA, 42 USC Section 4321 et seq., and with FTA's regulations, 23 CFR Part 771. The Mass DOT and MBTA issued the EA for public comment on October 3, 2011 and held a public hearing on October 20, 2011 pursuant to 23 CFR 771.119 in Somerville, Mass at the Somerville High School Auditorium.  The EA consisted of an Executive Summary, Volume 1 of Text, Volume 2 of Text and Volume 3 Appendices.

37. On June 11, 2012 the FTA Region I approved the PE phase for the GLX project. On July 9, 2012 the FTA Region I released its FONSI approving the GLX EA under 23 CFR 771.121 stating the project will have no significant adverse impacts to the environment with the mitigation Mass DOT and MBTA have committed and that the record provides sufficient evidence and analysis for determining that an Environmental Impact Statement ("EIS") is not required.

C. Description of the Project

38. The GLX will serve the cities of Cambridge, Medford and Somerville, MA. This PE approval is for an approximately 4.3-mile double track light rail line, seven station extension of the existing MBTA Green Line Light Rail Track ("LRT") line from a relocated Lechmere Station in Cambridge to College Avenue in Medford, with intermediate stations at Washington Street, Gilman Square and Lowell Street in Somerville, and Ball Square in Medford. Also included in the GLX is a separate one-mile LRT branch line from the relocated Lechmere Station to Union Square in Somerville. The GLX will operate on the exclusive right-of-way of the MBTA Commuter Rail System. The project will include six at-grade stations and one elevated station (the relocated Lechmere Station); three miles of at-grade guideway and 1.3 miles of elevated guideway; purchase of 24 LRT vehicles; construction of a LRT rail car storage and maintenance facility; and reconstruction of 11 bridge structures to maintain grade separation on the route. GLX service will operate as an extension of existing Green Line service from Lechmere.

39. FTA and its Project Management Oversight Contractor (PMOC) conducted a pre-PE risk assessment of the project in March 2011 based on the cost, scope, schedule and technical capacity and capability reviews done in late 2010.

40. Based on the results, FTA determined that Mass DOT's schedule for completion of the project by the end of 2014 was a significant risk. In response to the findings of the risk assessment report, Mass DOT updated the project schedule to show completion by June 2019. The cost estimate was updated from $953.74 million to $1,334.62 million to reflect the updated schedule, escalation costs, additional finance costs and other minor risks identified.

41. FTA has determined that the revised cost and schedule are reasonable for this phase of the project and that Mass DOT and the MBTA possess the technical capacity and capability to implement the project.

42. Some of the key items that Mass DOT and MBTA are to address during PE include an updated project delivery analysis within 90 days of entering PE. The documentation should provide an overall strategy for selecting a specific delivery method; a description and evaluation of the contract packaging approach; bid sequencing procurement schedule; market analysis; risk sharing strategies; and demonstrate that Mass DOT  and MBTA has the technical capacity and capability to manage the preferred delivery method. Continued maintenance and update of the master schedule to ensure activity timelines and interfaces remain realistic towards the June 2019 completion date. Implement progress monitoring and reporting. Consider hiring additional staff with experience in the project's selected delivery method and/or provide training to the key existing project staff.

43. Mass DOT is seeking $557.06 million (Year of Expenditure-YOE) in New Starts funds (41.7 percent) for the project. The remaining $777.55 million in funding is proposed to come from Massachusetts Commonwealth funding. Commonwealth bond funds of $558.75 million (41.9 percent) are proposed for direct capital construction costs, and Massachusetts general funds of $218.80 million (16.4 percent) are proposed to pay for project finance charges.

44. The GLX to College Avenue is part of the State Implementation Plan (310 CMR 7.36) and under 40 CFR Part 52 of the EPA Approval and Promulgation of Air Quality Implementation Plans. However, the law requires the FTA to evaluate

proposed projects seeking New Starts funding against a number of project

justification and local financial commitment criteria and to ensure that prospective

grant recipients demonstrate the technical, legal and financial capacity to

implement the project and the existing system.  FTA's standards for developing

financial ratings become more stringent as a project moves from PE to Final

Design ("FD").

45. While the GLX project has obtained a satisfactory financial rating for entry into

PE by the FTA due primarily to the level of committed capital funds to build the

project, the current financial plan assumes several large new, uncommitted

funding sources to address MBTA's state of good repair needs and ongoing

operations.

46. The new sources include transferring $1.6 billion of prior MBTA debt obligations

to the Commonwealth, implementing a new $0.01 per mile statewide tax on

vehicle miles traveled dedicated to the Commonwealth Transportation Fund, and

allocating casino gaming revenues to MBTA. Other options also listed in the

Mass DOT financial plan as potential new sources if the anticipated funding

approaches mentioned were to be insufficient or infeasible. These include

increasing fares, increasing the motor vehicle registration renewal fee, indexing

the $160 million annual contract assistance from the Commonwealth to growth in

sales tax revenue, dedicating a portion of the state motor vehicle sales tax

revenue to MBTA, increasing MBTA parking fees, implementing a commercial

parking tax and indexing the fuel tax to inflation.

47. Without new sources of revenues, significant negative annual balances in the financial plan would result and the state of good repair backlog would increase.

48. Considerable progress on gaining commitment of new sources of funding will be necessary before FTA will contemplate approval of the project into FD.

49. Continued development and strengthening of the financial plan will be a crucial part of the PE effort.

50. As project development continues, Mass DOT and MBTA must ensure that the vehicles, stations and facilities are designed and engineered to ensure compliance with current standards for accessibility under U.S. Department of Transportation regulations implementing the transportation provisions of the Americans with Disabilities Act of 1990 (ADA).

51. Mass DOT and MBTA were also required to independently verify manufacturers' claims of ADA compliance, and to consult with FTA's Office of Civil Rights concerning ADA requirements as project development progresses.

52. The Office of Civil Rights will be providing Mass DOT and MBTA a separate letter further detailing ADA compliance issues in the near future.

53. The Mass DOT and MBTA recently proposed consolidating their civil rights offices.

54. FTA is waiting for the submission of a full and complete description of the responsibilities of staff and a clear organizational chart identifying the responsible staff and their reporting relationship.

55. Mass DOT and MBTA must work with FTA during PE to address the concerns identified above, along with any others that are identified as project development progresses.

D. Potential Impacts GLX has not been adequately addressed in the EA and FONSI.

56. The GLX will establish a permanent light rail transportation corridor along the proposed route.

57. The potential air quality from diesel exhaust and its effects on this transit corridor have not been acknowledged and have not been adequately address in either the EA or FONSI.

58. The proposed project may have many impacts that were either not analyzed or not adequately analyzed in the EA.  Such impacts created by the construction, and cost of the project and other GLX activities include, but are not limited to:

    A. Adverse environmental impacts to the elderly, young children and environmental justice and disability populations in the city of Medford associated with diesel locomotive emissions and additional truck, bus and auto traffic due to proposed station designs and land development plans that have not been adequately addressed in the EA;

    B. Adverse social equity impact to environmental justice and disability populations in the area if all future funds are concentrated on building the GLX with no funds years to come to correct issues of inequality of transit service in minority populations such as in Boston as pointed out in recent

media reports. The negative social equity impact of the recent dramatic decrease (18%) in Para-transit ridership for the disability and elderly population as the result of inequitable fares increases to this population in July 2012, a foreseeable impact of which Mass DOT was aware and of which Mass DOT used old fare data to justify in their EA that there would be no social equity impact. And the lack of accessibility at older GLX stations, such as the Boylston Street station directly near the Mass transit building, creating a situation as in the song "Charlie on the MTA" where you may be able to get on, but not able to get off the GLX.

C. Adverse impacts to the road system in Medford such as increased wear and tear to roads and bridges and other infrastructure, and the increased cost to local taxpayers in the future;

D. Adverse impact to wildlife along the Medford corridor from lights and noise associated with a light rail transportation project.

E. Adverse impact to the Mystic River Watershed, other waterways and ecological habitat due to lack of proper attention to storm water management, construction of the transit project and associated land development use, increased salting and other maintenance activities pertaining to light rail transportation projects.

59. Impacts of GLX on the public were not adequately considered by Mass DOT and extending the project to Mystic Valley Parkway/Route 16 is not in the public interest.

60. Mass DOT under the State Implementation Plan 310 CMR 7.36 is only authorized to go to College Avenue in Medford with the GLX project.

61. Mass DOT putting forth an amendment to the FFY2013-2016 TIP with inclusion of the project to Mystic Valley Parkway/Route 16 with funding and without public notice to the abutters in this area is a gross misconduct of the public trust.

62. Mass DOT did not conduct any inquiry specifically regarding how the project would impact the public interest and did not include a finding or conclusion in the FONSI or EA that the project is indeed in the public interest.

63. Numerous adverse impacts to the public interest are likely to occur if the GLX project proceeds to Mystic Valley Parkway/Route 16.

64. These adverse impacts include but are not limited to:  impacts of land taking of residential and commercial private property, enhance exposure to diesel particulate matter of environmental justice and disability populations living within the affected area; adverse impact to the Mystic River Watershed, other waterways and ecological habitat due to storm water discharge, construction of the transit project and associated land development use, increased salting and other maintenance activities pertaining to light rail transportation projects; impact to a historic African American community through pressure of land use development that may cause gentrification and displacement of the environmental justice and disability populations.

## V.     VIOLATIONS of LAW
### COUNT ONE

**MASS DOT Violated and is Violating NEPA by Failing to Adequately Consider and Disclose Full Air Quality Impacts of the GLX in its EA.**

65. Plaintiffs reallege and reassert all previous paragraphs as if set forth in full herein.

66. In taking the action of moving diesel-powered commuter rail tracks closer to residential homes and small businesses, Mass DOT has failed

17

to acknowledge or analyze diesel impacts to local air quality and they have not identified diesel hot spot areas with identified mitigation. Mass DOT has not separated out diesel particulate matter (DPM) impacts in their analysis from ambient particulate matter pollution in the EA. They have arbitrarily and capriciously chosen which location they would chose to analyze instead of identifying DPM measurements along the length of the corridor. Diesel exhaust emissions from diesel engines used during construction must be added to the toxic burden considered for resident species, including vulnerable humans. This was mandated in the EENF and not mitigated in the EA/FONSI. Diesel exhaust is emitted from a broad range of diesel engines; the on road diesel engines of trucks, buses, and cars and the off road diesel engines that include locomotives, marine vessels, and heavy duty equipment. The sizes of diesel particulates, which are of greatest health concern, are in the categories of fine, and ultra fine particles, that can travel and impact beyond the Proposed Action Area from 30 – 100 miles and can remain suspended in the air for days or weeks.   The plaintiffs have submitted many public comments (verbal and written) by the plaintiffs as part of public engagement requesting DPM analysis. The EA upon which the FONSI is based provides no description of the modeling methodology or the model used in the analysis of Microscale Commuter Rail Evaluation.

67. Analysis of local impacts, taking into account local air conditions, is required by the Massachusetts Air Pollution Control Regulations, which prohibit emissions of air contaminants that alone or in combination with other air contaminants cause a condition of air pollution, 310 CMR -

7.01(1). Air pollution means the presence in the ambient air space of one or more air contaminants or combinations thereof in such concentrations and of such duration as to cause a nuisance, be injurious, or be on the basis of current information, potentially injurious to human or animal life, to vegetation, or to property, or unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business in the area of concern and surrounding areas. It is not enough to compare the emissions to state and metropolitan area standards.

68. Mass DOT has been unreasonable in its interpretation of the definition of Proposed Action under NEPA regulations, 40 CFR part 1508.18 Major Federal Action. Major federal action includes actions with effects that may be major and which are potentially subject to federal control and responsibility. Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts under the Administrative Procedure Act or other applicable laws as agency action. The movement of diesel-powered commuter rail tracks closer to residential homes and small businesses that is precipitated by construction of the GLX is an action under the EA that requires specific approvals regarding construction and management of activities located in a defined geographic area and is part of new and continuing activities that must be regulated and approved by federal agencies, hence, the FONSI.

69. Mass DOT has not met the requirement for health studies for areas in Medford impacted by the proposed GLX. A FONSI by the FTA Region I

should not have been approved and an EIS should have been reasonably required and should have been required that health studies be conducted.  A health study was called for within the Mass Transportation Reform Bill passed by the State Legislature and signed into law by Governor Deval Patrick in 2009. Under the Massachusetts Transportation Reform bill there is outlined the need for health studies regarding projects within 500 feet of transportation projects of which the GLX qualifies. This type of study is essential and a basic fundamental requirement.  There is a partnership that is required in this Transportation Reform Bill with the Dept. of Public Health in conducting these studies which has not occurred in the case of the GLX EA.

70. Diesel exhaust does not equal auto exhaust.  Diesel effects must be separated out in air quality studies.  Mass DOT provided inadequate and improper environmental studies on air quality, in particular on diesel fine and coarse particulate matter, and its public health effects on the human environment.  Mass DOT has proposed in the EA moving diesel-powered commuter rail tracks closer to abutters' properties without mitigation of the diesel pollution that currently exists.  And even though they mention the requirement of health studies, they do not show any such studies on diesel impact on these communities in Affected Environment. These abutters all ready experience environmental pollution from diesel particles on their homes, cars and land, which we have documented in a video presentation.  By moving the diesel-powered commuter rail tracks closer to their homes as proposed in the

proposed Green Line Extension, we challenge that this action will only exasperate these environmental issues.

71. It was essential to locate or create a cancer incidence and type survey for this particular area of Medford both over time and separate for age and race in the actions of the GLX. This is a basic and fundamental need under social equity requirements. These health studies were warranted based upon a report entitled "Environmental Justice Inventory for Ten Communities in the Greater Boston Area" researched and written by Tufts University's Urban and Environmental Policy and Planning Dept. This 2005 report was commissioned by the Massachusetts Environmental Protection Agency (MEPA) itself. The City of Medford is specifically highlighted in this report in regards to chronic disease indicators. Medford was noted to have 44 lung cancer deaths at an age-adjusted rate of 61.8, which was higher than the state age adjusted rate. As noted above, lung cancer has been identified as an issue of exposure to diesel particulate matter. There were 201 cardiovascular disease deaths at an area age adjusted rate of 253.6, slightly below the state age adjusted rate. These numbers need to be updated to create a baseline health impact from this transit project.

72. Environmental Justice issues are poorly served in the Environmental Assessment. Statistics show that Blacks/African Americans are more susceptible to lung damage and asthma from pollution and to lung cancer than non- blacks, with young and old particularly at risk. Area figures for this concern, by incidence, and percent, and in terms of propinquity to the proposed project should have been identified in a

required EIS by the FTA Region I. The EPA has recently changed its standards in the face of this mounting research evidence concerning the negative impact of particulates on health that the Mass DOT has failed to incorporate in its EA and the FTA Region 1 has failed to require in not requiring a EIS. Therefore we are requesting an injunction against this project until such health studies are conducted.

73. This FONSI and EA do not consider the significance of the action to those in the environmental justice and disability populations within the affected region, who are affected interests, and the locality in which they live in accordance with 40 C.F.R. § 1508.27 (a). Nor has the FONSI/EA addressed the degree to which the effects of moving diesel-powered commuter rail tracks closer to residential and businesses effects the quality of the human environment and whether the action is related to other actions with individually insignificant but cumulatively significant impacts to the human habitat in accordance with 40 C.F.R.§ 1508 27 (b). Title VI and Environmental Justice – Executive Order 12898 Federal Actions to address Environmental Justice in Minority Populations and Low-Income Populations- disproportionately high and adverse effects on minority and low income populations that affect human health or the environment should be identified and avoided. No such action has been identified in the EA/FONSI.

74. Mass DOT in its environmental assessment identified that this project would cause some localized decreases or increases in carbon monoxide and particulate matter. These hot spot areas have not been pinpointed within the FONSI/EA for mitigation. Air quality statistics omit vital

figures. How were data samples obtained? What was the height above the ground and exact locations in relation to vulnerable populations? What tests were used and what are their levels of confidence? When were these samples obtained; that is, time of day? Were test samples obtained on sunny versus cloudy or rainy days? Cloud inversions retain particulates. Rain washes them away. Sun cooks them into a variety of compounds, including breakdown products like, ozone and others that not have been included in the request and so are unmeasured but which still may have health effects. Damp, warm air holds more suspended than cool, dry air. Temperature and humidity are important. This vital information was not provided in the EA/FONSI. Air quality is measured only on a regional basis and does not identify impact at the local level even though Mass DOT has identified that some local areas may see increase in pollution. Mass DOT all ready admitted in its DEIR on page 6-8 of the detail assessment that this project would cause some localized decreases or increases in carbon monoxide and particulate matter. These localized areas of increases in carbon monoxide were not pinpointed within the EA/FONSI. An EIS should have been required that this relevant information be transparently made public to the communities involved. These areas need to be clearly identified and mitigated. The FTA Region 1 should have required that this information be held transparent to the communities involved and that mitigation measures be identified. We, as citizens, needed to be guaranteed through scientific studies that our air quality is not being negatively impacted by additional traffic congestion.

75. The EENF to this project, on page 22 of the document, Part A regarding air quality was not filled out.  There is no level for diesel and no level for particulate mentioned. The EENF and subsequent environmental reports, basically states there are no impacts.  We do not believe this is the case and that this premise relegates the project as flawed.  Again, on Page 22 of the EENF regarding compliance with federal, state regulatory plan and air resource requirement, we don't see measures they will take and carries through within the EA/FONSI.

76. Changes in peripheral and diameter and design of retaining wall will change facts.  Mass DOT is proposing high retaining walls that will cause a concentration of pollution to go straight up in the air and come straight down as opposed to disbursing.  We believe this concentration of pollution, as opposed to dissipating out of particulates, is a health hazard.

77. Environmental Justice Policy requires analysis of multiple air impacts; data on baseline public health conditions, analysis of technological, site-planning, and operational alternatives to reduce impacts; and proposed on-site and off-site mitigation measures to reduce multiple impacts and increase environmental benefits for the residents.  Such enhanced analysis can be required even though the project does not meet the technical requirements of the Environmental Justice policy for enhanced review. The Environmental Justice Policy, in the disclaimers section, specifically notes that the Policy is not intended to create any right enforceable against EOEA or any right to judicial review concerning compliance with the Environmental Justice Policy. Thus, requirements of

the policy can be extended to a project that does not meet the strict requirements for inclusion in the Policy. Further, the scope of an EA should have extended to all aspects of a project that are likely, directly or indirectly, to cause damage to the environment, 301 CMR - 11.06 (9), which by definition includes any actual or probable impairment (other than insignificant) to a natural resource, including air pollution, 301 CMR - 11.02. Such scope is authorized by the requirements for the contents of an EIR at 301 CMR - 11.07 (6) and should apply to this project.

78. The Executive Office of Environmental Affairs (EOEA), Environmental Justice Policy (EJ Policy) aims to ensure that high minority, non-English speaking, and low income neighborhoods have a strong voice in environmental decision-making; receive the full protection of existing environmental rules and regulations, and have increased access to investments that will enhance their quality of life by restoring degraded natural resources, enhancing open space, and building the urban park network. In so doing, it recognizes that low income and communities of color in Massachusetts suffer a hugely disproportionate amount of environmental harm. As documented in the report, Unequal Exposure to Ecological Hazards 2005: Environmental Injustices in the Commonwealth of Massachusetts, by Professors D Faber and E Krieg, environmentally hazardous sites and facilities are disproportionately located in communities of color and working class communities in Massachusetts, placing residents of those communities at substantially greater risk of exposure to environmental health hazards."

79. This project requires enhanced analysis because the diesel-powered commuter rail tracks will emit air contaminants into a community that suffers statistically significant high rates of diseases that could be caused or exacerbated by those air contaminants. Such analyses are also required because residents already suffer from unhealthy levels of diesel particulate matter in the air and the project would add to that burden. In performing the analysis for the EA, the project proponent failed to determine local air quality data around DPM. The project proponent should have determined air pollution data on DPM local to the project that would have a local impact.  By failing to do so, it failed to assess the intensity of potential environmental impacts, or to identify mitigation measures that could be taken.  Under 40 CFR part 1508.27 even if a Federal agency such as FTA Region I believes that on balance that the severity of impacts may be balanced there should have been an evaluation to consider the intensity on public health or safety and the unique characteristics of the geographic areas in which the action is to take place.

80. FTA Region 1 issued the FONSI/EA on July 9, 2012 without adequately identifying and analyzing all relevant environmental and socioeconomic impacts of this Proposed Action and without analyzing a reasonable range of mitigation to offset foreseeable effects.

## COUNT TWO

**MASS DOT Violated and is Violating NEPA by Failing to Adequately Consider and Disclose Full Storm Water and Discharge Resource Impacts of the GLX to the Mystic River Watershed in its EA.**

81. Plaintiffs reallege and reassert all previous paragraphs as if set forth in full herein.

82. The EA has identified wastewater discharge from Ball Square up into the Mystic River from this project. Best management practices around water quality resources should have been incorporated in the EA as required to meet applicable city, state and federal standards and requirements. The GLX EENF 7 II H - Describe the project's storm water impacts as : " A small increase in impervious surfaces" . This does not fully describe the more than doubling of the area of concreted land that is proposed, or the cutting of half of all mature trees that now will permit water absorption and encourage its channeling and flow. Bank contours will be altered to a steeper pitch. Runoff will be greatly enhanced. Flooding is likely to become common and more severe, and could cause the line to become nonfunctional.   With the change in pitch, the flow would become more turbulent and faster.  Storm water will be carried to and affect the Mystic River.

83. The Mass DOT has stated within its EENF through the EA to the FTA that GLX does not require review of Wetlands, Waterways, and Tidelands Thresholds / Permits.  But the Mass DOT has mentioned presence of water 5 feet by 800 feet near Cedar Street, a wet area 30x150 feet on the southwest side of the Lowell St. Bridge, which is said to be too far away from the GLX rails to affect their alignment. Mass DOT has stated that the property has flooded regularly and more severely with every heavy rain, with run off, and with hurricane impact

since the time cited of 2006. These periodic floods need to be accounted for, measured, mapped, and their safe and sanitary drainage characterized, approved by all authorities. By Mass DOT declaring there is no flooding, but showing it does flood and two recent instances of how it floods but denying the need to adhere to Wetlands and Waterway review is arbitrary and capricious. The EA should have identified if there was any discharge to Outstanding Resource Waters i.e. the Mystic River. The proposed construction of box like, impervious, concrete coffins to carry the transport cars facilitates run off and promotes back-up of water after storms or hurricanes. The toxic sludge of the channel will then be free to drain into the Mystic River. Current FEMA charts show this land as subject to flooding.

84. Because of these facts, and because of the official attitudes that surround them, as citizens of the region and among those that use the fish of the Mystic as food, its waters for swimming for boating and skulling and who find its beauty compelling, we believe an EIS should have been required before these toxic incursions destroy the plant/fish/bird/amphibian/small animal ecosystems that support the beauty.

85. There is a corollary caution to the sewage outflow into the Mystic backflow. When storms come and river levels rise, river water can be expected to provide backflow into the concrete channels. As the river falls after the storm water and sewage will drain into the Mystic Waterway. The effects of the chemicals, bacteria, stench and currents on humans, groundwater and wildlife as a result must be and are not

accounted for by the GLX EA and a EIS should have been required.
The paths, and effects of drainage, sewage, and other effluents from the concrete of the GLX should have been required to be characterized and quantified. The lives, health and security of surrounding humans, birds, insects, plants, amphibians, animals (rats included), bacteria, fungi, etc, need to be enumerated and assured.

86. FTA Region 1 issued the FONSI/EA on July 9, 2012 without adequately identifying and analyzing all relevant environmental and socioeconomic impacts of this Proposed Action and without analyzing a reasonable range of mitigation to offset foreseeable effects.

## COUNT THREE

**MASS DOT and the FTA Region I Violated and is Violating FTA regulatory Public Engagement requirements in Transportation Planning and violating the Title VI Civil Rights Act of 1964, Executive Order 12898, the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, and the Department of Transportation's implementing regulations at 49 CFR Parts 21, 27.27 and 38**

87. Plaintiffs reallege and reassert all previous paragraphs as if set forth in full herein.

88. FTA planning regulations create a statutory and regulatory framework of proactive program of engagement, interaction and accountability involving decisions makers, interested parties, and the public, including environmental justice and disability populations.  Prior to and during the FEIR and DEIR process of the GLX, GLAM and its individual members made known their interested party status and contended that environmental justice and disability populations were being marginalized from participating in the proposed Green Line Extension process by

Mass DOT in violation of FTA Public Engagement regulations and Civil Rights laws. As group that includes people with disabilities and members of the environmental justice population we followed with a Federal Transportation Administration's Office of Civil Rights (FTA OCR) complaint concerning these exclusionary practices, including meetings held in accessible places with lack of proper accommodation, and various other issues that arose around what we believe was inherent discrimination in the process under Title VI and the Americans with Disabilities Act (ADA). This complaint was filed in August 2009 and was provided Case Number FTA #09-0350 by the FTA.

89. On May 23, 2011 the FTA OCR accepted our prima facie evidence by stating it would conduct an on-site compliance review of Mass DOT in 2011 and would address the complaint from a broader perspective by this compliance review with the intent of resolving any issues of non-compliance identified. The issues the FTA OCR office identified from our complaint was the lack of ensuring that the environmental justice, small business, and disability communities are being adequately considered as the Green Line Extension project development continues to progress. This information was provided within EA comments as well. The PE approval letter of June 11, 2012 by FTA Region I to Mass DOT states, "that the OCR will provide Mass DOT/MBTA a separate letter further detailing ADA compliance issues in the near future." We are awaiting a report on Case Number FTA #09-0350 as requested to the FTA OCR.

90. The GLX process marginalized representation by the environmental justice and disability communities of Medford despite their presence in the GLX project area. The Station Design Work Group identified in the Public Involvement Plan of GLX FEIR, and carried through to the EA, excluded appointments by Mass DOT of representation of the disability and environmental justice populations keeping them isolated on the far out skirts of the process.  We are aware that the President of the local NAACP Mystic Valley Regional branch applied for and was denied membership on the Station Design Work group. He is a Medford resident impacted by the proposed Green Line Extension.  Instead, Mass DOT selected a white architect who lives across the street from the NAACP president.  Yet when concepts were brought forth by the Station Design Work Group, this architect never outreached to the environmental justice community or disability community within his reach, a part of the stated responsibilities assigned by Mass DOT to the Station Design Work Group members.   We are aware that a disability resident of Medford who is impacted by the proposed project at College Avenue, and who is a certified ADA monitor with the Commonwealth's Office of Disability was denied membership on the Station Design Work group as well.  We also are aware there was only one African American member of the Citizens Advisory Committee who resigned early on in the process due to Mass DOT marginalizing her from timely and prompt information and data, hindering her ability to participate.  There was one self identified member of the Citizens Advisory Committee who in our FTA OCR complaint is identified was harassed at Mass DOT meetings

without intervention by the Mass DOT meeting facilitator, creating a hostile environment for this individual.

91. Meetings such as the Citizen Advisory Committee meetings, public meetings/hearings and station design workshop meetings violated the ADA without providing minimum ADA standards. Many public meetings including the public hearing on the EA were held at the Somerville High School Auditorium of which we noted to Mass DOT as inaccessible. They refused to address this issue. Therefore, Mass DOT's actions resulted in marginalizing those from historically disenfranchised populations. In January 2011, the U.S. Dept. of Education found that the Somerville High School was indeed in violation of the Americans with Disabilities Act as we had noted to Mass DOT. The City of Somerville's Public Schools are now under Resolution Agreement with the U.S. Department of Education under Complaint Nos. 01-10-1012 and 01-10-1 100 to come into compliance with the ADA. Yet Mass DOT held its EA public hearing in this facility.

92. Station Design Workshops were not designed to eliminate barriers to active participation by all members of the community. Conference pictures of meetings on the Green Line website show the public being asked by Mass DOT to put comments on post it notes. This is inadequate and limits public comments and allows anyone in opposition to your comment to easily pull it off the board. This format does not accommodate the needs of persons who are linguistically and culturally isolated, as well as persons with disabilities. Someone with mobility impairment or in a wheelchair could not reach a board to firmly plant

their post it note and there were no facilitators specifically trained to assist people with disabilities or those with linguistic challenges. There were no translators (sign or language) available at meetings nor was there newsletters provided in second language at meetings. We attended the majority of meetings. There were many other ADA issues such as not having assistive listening devices readily available at meetings and poor sound systems. These issues were notated to the Mass DOT planner and facilitator many times, yet, they failed to mitigate these public engagement issues within the GLX process. These issues were not address in the EA/FONSI by the FTA Region I.

93. Social Equity analysis has not been properly analyzed under the EA. Mass DOT raised ridership fees on July 2012 due to financial constraint from significant deficits and maintenance backlog.  Mass DOT in its Environmental Assessment report used old data concerning ridership fees even though it was reasonably foreseeable that increases would occur.  Since the intent of increase was well known when preparing the EA, Mass DOT arbitrarily and capriciously did not use data that has now shown the impact to para-transit with an 18% decrease in ridership since July 1, 2012 according to the MBTA's figures published in media papers. There should have been a service equity analysis that determined the true impact on the disability community with the burdened of cost associated with the GLX within the EA/FONSI. The GLX Risk Assessment report (page 5, item 3) all ready expresses concern for the capacity of the Green Line Extension D line to increase services beyond Government Center. This issue should have been addressed in this EA

report as it has impact for those with disabilities upon whom the MBTA was trying to redirect from para-transit to light rail services. No identified mitigation measures are stated in the EA/FONSI. We ask for an injunction on this project as its financial impact has a significant detriment to the disability community.

94. In the January 10, 2012 cover letter response by Mass DOT to the FTA on Responses to Comments on the October 2011 Environmental Assessment, Mass DOT Transportation Project Manager for the GLX, Ms. Katherine Fichter writes about action the Mass DOT will take to inform the public with information on how various public comments were addressed, "Second, copies of the Responses to Comments Memo and the Summary Matrix will be sent to each agency and all individuals who commented on the EA." This did not happen. Plaintiffs Ms. Carolyn Rosen, Dr. William Wood and GLAM's independent reviewer, Dr. Marlene Warner received no such information.

95. FTA Region 1 issued the FONSI/EA on July 9, 2012 without adequately addressing the inequity in public engagement processes and civil rights issues identified in the GLX project that marginalized protected class citizens.

## COUNT FOUR

**MASS DOT and the FTA Region I Violated and is Violating the NEPA by Issuing its FONSI and EA decision based upon false claims by Mass DOT as submitted in its EA concerning the Preferred Alternative of Mystic Valley Parkway/Route 16.**

96. Plaintiffs reallege and reassert all previous paragraphs as if set forth in full herein.

97. By submitting an EA with false claims the Mass DOT failed to provide, to the public, important, relevant items of information during the decision-making process concerning Mass DOT's Preferred Alternative of Mystic Valley Parkway/Route 16.

98. In its Response to Comments on the EA by Mass DOT states on page 6 of 10, "While the extension to Mystic Valley Parkway was reviewed and presented as an alternative, Mass DOT has decided to, for a variety of reasons which are described in the EA, terminate the project at College Avenue at this point in time. . . The environmental impacts of a future extension of the Green Line to Mystic Valley Parkway would be assessed using the NEPA process at a future date, if Federal action were to be involved.  Revisions to the EA are not required for any comments on the extension to Mystic Valley Parkway/Route 16."

99. An estimated three months before issuance of the FONSI by the FTA Region I, the Mass DOT put forth a motion at the Boston Metropolitan Planning Organization (MPO) meeting of April 19, 2012 as reflected in the MPO minutes to include Mystic Valley Parkway for federal funding within the FFY2013-2016 Transportation Plan (TIP) with intent to extend to this area in the same phase as the extension to College Avenue. Minutes of this meeting quote the following motion as put forth by Mass DOT: " "Motion #2  - A motion to amend the TIP as presented to incorporate the changes as shown in MassDOT Motion #2 was made by MassDOT (N. Codd), and seconded by the Inner Core Committee (T. Bent). The amendment would move the Brookline - Gateway East and

**Marlborough – Route 85 projects off of this TIP, and program $8.1 million for the Green Line Extension to Route 16 project in FFY 2016. The motion carried."** The Mass DOT thereby showed that it had intent to circumvent the current NEPA process by creating an obfuscation of the process and putting forth the Preferred Alternative to MPO preventing the public awareness of analysis of environmental impact, land taking impacts, construction impacts and cumulative effects upon the human environment and socioeconomic impacts within the affected area.  Thereby, Mass DOT failed to meet Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and low income Populations, DOT order 5610.2, Dept. of Transportation Order to address environmental justice as living within the historic neighborhood of environmental justice and disability communities within the West Medford community.

100.                        Mass DOT stated in its EA that it was only applying for federal funding from the FTA for the Green Line Extension to College Avenue only in its Response to Public Comments.  Mass DOT supported and funded a planning process conducted by the Metropolitan Area Planning Council (MAPC) that obfuscated and confused the public during the EA process regarding the GLX to Route 16.

**101.**                        Examples of this confusion are articulated in the June 28, 2012 MPO minutes where Medford residents presented their concerns about the MAPC recommendation to fund this Preferred Alternative.  Medford Resident Mary Ann Aducci: **"She noted that Medford**

residents were under the impression that the Green Line Extension to Route 16 lacked funding, until they learned of the MPO's action to program the second phase of the Green Line project. She asked the MPO not to vote on the project until abutters are informed that the project is viable again, and to give consideration to the concerns of seniors and people with disabilities, and other residents who live near the proposed station area. She stated that building the Green Line to College Avenue satisfies the legal mandate to build the line." Anita Nagem, Medford resident, "expressed vehement opposition to the Route 16 terminus of the Green Line, a feeling she said is shared by her neighbors. She stated that residents were not notified of the MPO's action to fund the Green Line Extension to Route 16. She also expressed the view that MAPC's visioning meetings appeared designed to achieve a pre-determined result, with the focus on how the terminus area would be developed, while residents' concerns about traffic, parking, and gentrification of an African-American community were not addressed. While expressing support for the Green Line Extension to College Avenue, she asked the MPO to remove funding for the extension to Route 16."

102.    Despite a Boston Globe article covering a final MAPC community vision meeting in Medford, where it stated there was little to no support for this Preferred Alternative in Medford, E. Bourassa, transportation planner for MAPC was documented in the April 19, 2012 MPO meeting minutes as expressing MAPC's support for the extension to Route 16. The minutes state he ". . . *remarked on the community support for the project, and the project's potential to produce a mode shift from cars to transit,*

*promote economic development, generate tax revenue, and support smart growth and sustainable development. T. Bent [a Somerville member of the MPO board} expressed agreement with E. Bourassa's points. He stated that the MPO programmed the project on the LRTP and that the project is a legal commitment. D. Mohler also expressed MassDOT's support for the project, but noted that MassDOT does not believe that this portion of the extension is a legal commitment under the State Implementation Plan."* We can provide witnesses to community meetings where MAPC supported the position that the Preferred Alternative was a mandated legal commitment, thereby confusing and misleading the public with false information.

103.    The NAACP branch board voted to go on MPO public comment record to oppose the Preferred Alternative of the Green Line Extension to Route 16 in May 22, 2012, and prior to that they documented their concerns as well in the SIP process to Mass DOT.  The NAACP branch recognized, as did the disability community, that they were not being brought into the public engagement decision making process at the Mass DOT and MPO levels.  FTA Public Engagement regulations require that environmental justice and disability communities be actively engaged in the decision making process.  It is important to recruit members of environmental justice and disability populations to participate.

104.    The MAPC did not hold their public meetings within the Preferred Alternative location impact area where a historic African American community is located at Mystic Valley Parkway/Route 16, as well as, an elderly/disability housing project, thus holding their meetings in non

neutral locations owned by Tufts University a large proponent of the
Preferred Alternative. They developed a meeting format that MAPC
controlled exclusively and that did not allow everyone to participate to
allow maximum input. They did not consider that people have different
learning styles, educational attainment levels and literacy skills in the
affected area. Therefore, MAPC did not assess a group's preferred
types of communications prior to a meeting. There was no provision of
notices to the environmental justice and disability populations to
encourage they participate.  Public comments were submitted to MAPC
to correct these issues and they did not mitigate resolution.

105.    By providing discriminatory public engagement on the Preferred
Alternative by MAPC and the inference by the MAPC that the project
was a mandated legal commitment, and outright statements, to confuse
the public, as can be attested by witnesses who attended their meetings,
and the fact that Mass DOT has provided no Environmental Assessment
on this Preferred Alternative, and that the FTA Region I has approved a
EA/FONSI without requirement for an EIS that includes the Preferred
Alternative, we believe that these three agencies have violated the
MASS DOT Order 5610.2(a) to determine if the environmental effects of
the Preferred Alternative has adverse effect and disproportionately high
and adverse effect upon environmental justice and disability populations
within the Preferred Alternative area, including the catchment area as
identified within the MAPC presentation that includes West Medford
businesses and residences. Adverse effects include, but are not limited
to: air, noise and water pollution and soil contamination, destruction or

disruption of community cohesion or a community's economic vitality,
vibration, increased traffic congestion, isolation, exclusion, or separation
of minority or low income individuals within a given community or from
the broader community, and will these adverse effects be predominately
borne by the environmental justice and disability populations.

106.    FTA Region 1 issued the FONSI/EA on July 9, 2012 without
adequately addressing the public engagement and civil rights issues
identified in the GLX project.


## PLAINTIFF'S PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

1. Declare that the Defendants violated the National Environmental Policy Act,
and their implementing regulations in designing, analyzing, and implementing the GLX
and FONSI/EA;

2. Order the Defendants to withdraw the GLX FONSI/EA until such time as the agency
demonstrates to this Court that it has adequately complied with the law;

3. Enjoin the Defendants and its agents from proceeding with implementation of the
GLX, or any portion thereof, unless and until the violations of federal law set forth herein
have been corrected to the satisfaction of this Court;

4. Remove the FTA Region I oversight of the NEPA process due to its lack of arm's
length relationship and possible conflict of interest with the Mass DOT at the local level.
Require that the EIS be reviewed at a higher federal level.  The FTA Region I maybe
too close and affected to be able to give reasonable award to Mass DOT;

5. Award Plaintiffs its costs of suit; and

6. Grant Plaintiff such other and further relief as this Court deems just and equitable.

Respectfully submitted and dated this 18th day of January, 2013.

Dr. William Wood (Pro Se)
25 Bussell Road
Medford, MA 02155

Carolyn Rosen (Pro Se) and
(As Elected Chair of GLAM)
25 Bussell Road
Medford, MA 02155